1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF CALIFORNIA
2

      Corey Hughes,
3             Plaintiff,
                                      Sacramento, California
4      vs.                            No. 2:18-cv-03188
                                      Tue., Sep. 29, 2020
5      City of Stockton, et al.,      2:11 p.m.
              Defendant.
6      _____/

7               TRANSCRIPT OF HEARING VIA ZOOM
         BEFORE THE HONORABLE JOHN A. MENDEZ, DISTRICT JUDGE
8                        ---oOo---

9    APPEARANCES:

10     For the Plaintiff:           Helbraun Law Firm
                                    555 Montgomery Street
11                                  Suite 605
                                    San Francisco, CA  94111
12                                  By:  David M. Helbraun
                                    Attorney at Law
13
       For the Defendants M.        City of Stockton
14     Rodriguez and Molthen:       425 N. El Dorado Street
                                    2nd Floor
15                                  Stockton, CA  95202
                                    By: Jamil Radwan Ghannam
16                                  Deputy City Attorney

17     For the Defendants Casillas  Office of the Attorney
       and C. Rodriguez:            General
18                                  455 Golden Gate Ave.
                                    Suite 11000
19                                  San Francisco, CA 94102
                                    By: Allison Michele Low
20                                  Robert M. Perkins
                                    Deputies Attorney General
21
       Official Court Reporter:     Kimberly M. Bennett,
22                                  CSR, RPR, RMR, CRR
                                    501 I Street
23                                  Sacramento, CA 95814

24     Proceedings recorded by mechanical stenography, transcript
       produced by computer-aided transcription
25

1          (Court called to order, 2:11 p.m.)

2              THE CLERK:  Calling civil case 18-3188, Hughes vs.

3    Rodriguez, et al.

4              THE COURT:  Do I have everybody?  I have Ms. Low.  Do

5    I have Mr. Helbraun?

6              MR. HELBRAUN:  Yes, Your Honor.  Mr. Helbraun is

7    present.  Thank you.

8              THE COURT:  Starting with you, Mr. Helbraun, why

9    don't you go ahead, have the attorneys state their appearances.

10             MR. HELBRAUN:  Yes, Your Honor.  David Helbraun

11   appearing on behalf of the plaintiff, Corey Hughes, Your Honor.

12             THE COURT:  Okay.

13             MR. GHANNAM:  Good afternoon, Your Honor.  Jamil

14   Ghannam, Deputy City Attorney, on behalf of Officer Michael

15   Rodriguez and Sergeant Robert Molthen.

16             THE COURT:  You pronounce your last name Ghannam?

17             MR. GHANNAM:  Ghannam, yes, sir.  Thank you.

18             THE COURT:  Ghannam?

19             MR. GHANNAM:  Ghannam.

20             THE COURT:  Ghannam.  Gotcha.  Okay.

21        Mr. Ghannam, since we're on video I won't give you too hard

22   of a time, but you might want to have a jacket next time.

23             MR. GHANNAM:  I apologize, Your Honor.

24             THE COURT:  No problem.  Just giving you a hard time.

25             MR. GHANNAM:  There is a tie.

1          THE COURT:  You have a tie.  I appreciate that.

2     Go ahead.  Okay.  Other attorneys.

3          MR. PERKINS:  Good afternoon, Your Honor.  Robert M.

4  Perkins, III on behalf of defendant Agents Harvey Casillas and

5  Christopher Rodriguez from the California Department of

6  Corrections and Rehabilitation.

7          MS. LOW:  Hello, Your Honor.  Allison Low, cocounsel

8  to Mr. Robert Perkins.

9          THE COURT:  Okay.  All right.  I have before me

10  motions for summary judgment filed by defendants Michael

11  Rodriguez and Robert Molthen, M-O-L-T-H-E-N, and a motion for

12  summary judgment filed by defendants Casillas and C. Rodriguez.

13  Mr. Casillas' first name is Harvey.  Mr. -- the other

14  Mr. Rodriguez's first name is Chris Rodriguez.

15     Okay.  There are four claims in this case, a 1983 claim

16  against all four defendants, Bane Act claim against Mr. Michael

17  Rodriguez only, a negligence claim against all four defendants,

18  and an assault and battery claim against Mr. Michael Rodriguez

19  only.

20     There were a number of evidentiary issues raised in the

21  pleadings.  I just want to make note -- take note of those.

22  Agent Casillas and Agent C. Rodriguez requested judicial notice

23  of certain documents related to the bench warrant issued

24  against Mr. Hughes in the criminal case, documents related to

25  the criminal charges against Mr. Hughes in San Joaquin County.

1        In terms of the judicial notice request, it really doesn't

2   and didn't play a role and does not play a role in the motion.

3   It's a side issue.  I can take judicial notice of the existence

4   of those documents.  It's undisputed that he had been arrested,

5   he had been incarcerated, and he escaped.  I really don't need

6   to take judicial notice of that.

7        There are other evidentiary objections that plaintiff

8   submitted to the defendants' exhibits in support of the motion

9   for summary judgment.  These were opposed by the defendants.

10   Officer M. Rodriguez and Sergeant Molthen also submitted

11   evidentiary objections to plaintiff's expert evidence.

12        I'm not going to address specifically each and every one of

13   these objections.  There is a case, Burch vs. Regents of The

14   University of California, written by Judge Shubb of our court,

15   which I would urge all attorneys who file motions for summary

16   judgment to read.  In effect, the case urges lawyers that there

17   is no need for such evidentiary objections at the summary

18   judgment stage.

19        Despite our pleas -- this case was written back in 2006 --

20   we just can't overcome what lawyers are taught in law school,

21   and that is, we've got to file evidentiary objections.  Judges

22   in courts self-police when it comes to evidentiary objections

23   for summary judgment motions, and the evidentiary standards

24   aren't the same for summary judgment motions as they are for

25   trial.  We know that; nevertheless, we get thousands of pages

1   of unnecessary evidentiary objections in every summary judgment

2   motion.

3        So I'm not, again, picking on these specific lawyers, just

4   trying to urge lawyers in the future to recognize that the

5   evidentiary objections do little or nothing to advance the

6   arguments, and under the Burch case the Court will not, as I

7   said, address and rule on each and every one of these

8   objections.

9        Okay.  Let me get to the bottom line here, the gist of the

10  issue, Mr. Helbraun, that I see in both these cases that causes

11  problems for your client.

12       On the claim of excessive force, it is a claim brought

13  under the Eighth Amendment, as required, not under the Fourth

14  Amendment.  That changes the analysis.  There are different

15  standards, given that your client was someone who was on the

16  lam, I think I saw that phrase used in the briefs, that his

17  claim of excessive force is looked at, analyzed somewhat

18  differently than if it was a Fourth Amendment claim.

19       And the problem I see with your client's response to the

20  summary judgment motions in trying to raise a genuine issue of

21  material fact is the same problem that the individual in the

22  Supreme Court case of Scott vs. Harris faced, and that is the

23  record in this case includes a videotape.  And in reviewing the

24  briefs, and in particular the reply briefs, which, obviously,

25  you didn't get a chance to respond to in writing but I'll give

1    you a chance here today, your client's credibility and analysis

2    of what happened inside that house on that day is seriously

3    undermined.

4        I've watched all the videotapes.  And as the Supreme Court

5    said in the Scott vs. Harris case, that when there is a

6    videotape body camera evidence involved, that summary judgment

7    standard where the facts must be viewed in the light most

8    favorable to the nonmoving party, that only applies if there is

9    a genuine dispute as to those facts.

10       And the Supreme Court writes, As we have emphasized, when

11   the moving party has carried its burden under Rule 56(c), its

12   opponent must do more than simply show that there is some

13   metaphysical doubt as to the material facts.  Where the record

14   taken as a whole could not lead a rational trier of fact to

15   find for the nonmoving party, there is no genuine issue for

16   trial.  The Supreme Court cites to the Matsushida Electric

17   Industrial Company vs. Zenith Radio case.

18       The Supreme Court goes on to write, The mere existence of

19   some alleged factual dispute between the parties will not

20   defeat an otherwise properly supported motion for summary

21   judgment.  The requirement is that there be no genuine issue of

22   material fact.

23       In Scott vs. Harris, the Court wrote, When opposing parties

24   tell two different stories, one of which is blatantly

25   contradicted by the record so that no reasonable jury could

1   believe it, a court should not adopt that version of the facts

2   for purposes of ruling on a motion for summary judgment.  That

3   was the case here with regard to the factual issue, whether

4   respondent was driving in such fashion as to endanger human

5   life.

6       Your client's version in this case before me is a version

7   in which he claims he was headed towards the door, he was ready

8   to surrender, he caught the eye of the police officer, he even

9   had his hands out, waving them, the police should have seen --

10   seen him.  All that is contradicted by a very impressive reply

11   brief in which it took certain clips from the body camera and

12   completely contradicted your client's version of, I was about

13   to surrender before he let that dog loose.

14       Your client also had an opportunity earlier in the morning

15   to surrender.  Your client had three weeks to surrender.  It's

16   an objective view.  You know, it's what the police did.  It's

17   not from the subjective of view of the police officer, but from

18   the viewpoint of an objective police officer, is what they did,

19   in any way could that be considered a violation of your

20   client's constitutional rights under the Eighth Amendment, and

21   I think that body camera just completely undermines your

22   client's case.  That's, sort of, point one.  I'll let you

23   address that.

24       Point two is the second argument raised by the defendants

25   here, and that is qualified immunity.  You've got a serious

1   qualified immunity problem with all four of these defendants.

2   And particularly with the other three defendants besides

3   Michael Rodriguez, and in particular the officer that actually

4   wasn't involved in any way with the takedown of Mr. Hughes.

5       Those are just two of the most significant problems with

6   your client's case, and the two arguments I found to be most

7   persuasive with respect to the summary judgment motion.  So

8   I'll let you -- I'll give you an opportunity to respond in

9   particular to what the reply briefs laid out.

10          MR. HELBRAUN:  Yes, Your Honor.  And if I may, I

11   would also, obviously, reply to Your Honor's comments.

12      Start by saying, Your Honor, that all of the cases and all

13   of the policies say that if you're going to use a canine

14   attack, that kind of severe force, there has to be an imminent

15   threat.  And none of the defendants have disputed that fact.

16      So yes, Your Honor, my client was an escaped inmate.  He

17   was not actively resisting.  He was not an imminent threat.

18   Could they use some type of force to apprehend him?  Of course,

19   Your Honor.  However, what they chose to use was a canine.

20   Your Honor, before they ever entered the house, all of the

21   testimony is that it was a joint decision by the CDCR agents

22   and by the Stockton Police Department members who we sued, as

23   well as some sheriff people who we've now settled with.

24   Everybody decided before they went in, knowing that this man

25   had no history of violent offenses, was not a violent offender,

1    did not escape in a violent way, was not an imminent threat at

2    that time.  In fact, minutes before they went in, Your Honor,

3    the only independent witness, Hal Ward, told them he was in

4    there alone, he spent the night -- that is, the plaintiff was

5    in there alone, spent the night, he's calm, he would like to

6    surrender, let me go in and get him --

7            THE COURT:  Mr. Helbraun, let me interrupt you just

8    on that point.

9        The officers didn't know that beforehand, before they went

10   in, they didn't know he was calm.  All they knew is that they

11   had a guy that had been -- that disappeared and had done

12   nothing to turn himself in for three weeks.

13           MR. HELBRAUN:  That's true, Your Honor.

14           THE COURT:  So as I listen to your argument, I'm -- I

15   have to, obviously, think, is there any way a jury could accept

16   this?  And the answer is no, it's not true.  What it ignores is

17   everything that went on before they opened that door and still

18   didn't see your client try to surrender.  That's the problem

19   with your brief, it ignores, I think, and mischaracterizes the

20   undisputed history of your client.

21       This is a guy that was in prison -- that was in jail, and

22   had been out in the public for over three weeks hiding from and

23   avoiding the police.  That's what the police knew.  And then

24   when they opened that door, they don't see your client.  And

25   again, you know, he claims he was sleeping.  Whether he was

1   sleeping or not at 10:30 in the morning, they gave him a

2   chance.  They gave him a chance the prior three weeks to

3   surrender.  That's what your argument ignores.  And I can't

4   ignore that, and a jury obviously couldn't ignore that as well.

5            MR. HELBRAUN:  Your Honor --

6            THE COURT:  That's part of the problem -- that's part

7   of the big problem with your case.

8            MR. HELBRAUN:  I understand, Your Honor, and it is a

9   big problem with the case.  However, a reasonable juror could

10  conclude, under the undisputed facts offered by the defendants'

11  own testimony, all of the defendants here today have testified,

12  and we've cited, they knew the substantial risk of substantial

13  harm to my client, they knew they should only use a canine on a

14  violent offender in a high risk situation.

15       And you're absolutely right, Your Honor, the argument by

16  the defendants is, gee, he was an escaped prisoner so we're

17  entitled to do this.  However, the policies and the cases say

18  otherwise, Your Honor.  Chew v. Gates, 1994, you don't keep a

19  dog on someone for a prolonged period of time, especially if

20  they're not resisting, especially if they want to surrender.

21       The videotape, Your Honor, that you point to, number one

22  doesn't show what happened beforehand, number two the videotape

23  of Garcia, I believe it's Exhibit K to the Stockton defendants,

24  is very good for plaintiff because you see not only does

25  Michael Rodriguez rush through the announcements, he -- he

1    rushes through them, he gives a couple of seconds before he

2    releases the dog, and what happens, the dog is gone for maybe

3    two seconds and then my client falls into the frame.  He was

4    obviously near the door, Your Honor.

5        And he had no weapons of any kind.  They admit that he had

6    no weapons in his hand, no knives, no nothing.  He wasn't there

7    to ambush them.  And what they knew before they made the

8    decision to use a canine, Your Honor, was what Hal Ward told

9    them, that he did not have weapons, he was alone.

10       In addition, Your Honor, they had him surrounded.  They had

11   22 other officers surrounded.  So yes, Your Honor, some degree

12   of force may have been required, although we don't know because

13   they did not give him a genuine opportunity to surrender.  It

14   was still rushed.

15       There is an issue about a loud speaker announcement.  I

16   would point out to Your Honor that even defendant Harvey

17   Casillas says he never heard any loud speaker announcements.

18   At a minimum, Your Honor, that creates a genuine dispute of

19   fact as to what these announcements were and who would have

20   heard them.  Now, Hal Ward, the independent witness, was also

21   inside the house, did not hear any loud speaker announcements.

22   So there was a genuine material dispute as to whether any loud

23   speaker announcements should have put my client on notice that

24   there were police officers outside with a dog.

25               THE COURT:  That's not -- just so you know,

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1   Mr. Helbraun, that's not a material fact.  That may be an

2   issue -- a genuine issue of fact, but it's not a genuine issue

3   of material fact.

4          MR. HELBRAUN:  Well, they --

5          THE COURT:  It just isn't.

6          MR. HELBRAUN:  I'm sorry, Your Honor.  They seem to

7   think that the announcement by the loud speaker was material.

8   I'm happy to put that aside.  The only announcement that was

9   material was the announcement made at the door, which is

10  obviously rushed if you view the videotape.

11     And speaking of videotapes --

12         THE COURT:  You and I will disagree that -- you and I

13  will disagree that it was rushed.  Okay.

14         MR. HELBRAUN:  I understand, Your Honor.

15         THE COURT:  I know that's your characteristic, but,

16  you know, I don't view the videotape in the -- to the eyes of

17  an advocate, I view it as a neutral.

18         MR. HELBRAUN:  I understand, Your Honor.  However --

19         THE COURT:  You and I, again, would disagree that it

20  was rushed.  And it's that body cam footage that then becomes

21  the facts as opposed to the facts in the light most favorable

22  to the plaintiff because I -- I can see what happened.  I can

23  put myself in the place of a juror and see what happened there.

24  And again, that's -- that's sort of the lesson from the Supreme

25  Court case, Scott vs. Harris, that I -- for summary judgment --

1    and I understand, summary judgment is a difficult standard for

2    defendants to meet, but having body camera footage makes all

3    the difference here.  It really does.

4              MR. HELBRAUN:  Your Honor --

5              THE COURT:  As I said, it just undermines your

6    client's credibility.

7              MR. HELBRAUN:  If I may address the body camera

8    footage, because while some of it may undermine some of my

9    client's credibility, credibility issues are, of course, an

10   issue of fact for a jury.

11      But let me address your point --

12             THE COURT REPORTER:  Excuse me.  Excuse me.  Slow

13   down, please.

14             THE COURT:  Slow down.

15             MR. HELBRAUN:  -- your point in Scott v. Harris, Your

16   Honor.

17      Scott v. Harris was a high risk, imminent threat situation.

18   It was a car chase.  And there was footage that showed that the

19   defendant -- the plaintiff in the case was driving the car.

20      Now, the body camera footage here does not show the dog on

21   my client after he falls, does not show the prolonged struggle

22   with my client.  I think what you're referring to is that the

23   body camera does not show his outstretched arms, as he said.

24   Now whether or not from the angle of that body camera you can

25   see it, I don't know.

1      The body camera of Michael Rodriguez for some reason turns

2  off when they actually encounter him.  And Michael Rodriguez

3  has an explanation for that now but he didn't put it in his

4  contemporaneous report.  He's got new information now that he

5  didn't think was important then, even though the policies of

6  his department required him to say that.

7      So the body-worn camera only shows my client falling

8  forward immediately with a dog on him, and after that we hear a

9  lot of what's going on but we don't see it.  My client says he

10  wasn't resisting.  Whether he was resisting or not, Your Honor,

11  the defendants admit there were three officers on him, hands

12  on, plus the dog.

13      Your Honor, Chew v. Gates, Mendoza, the Low case, they all

14  say you cannot unnecessarily prolong a canine attack.

15          THE COURT:  Are those all Eighth Amendment cases,

16  Mr. Helbraun?

17          MR. HELBRAUN:  Well, that's interesting, Your Honor.

18  I'd like to talk about the Eighth Amendment, but putting that

19  aside --

20          THE COURT:  Why don't you answer my question, though.

21  Are those Eighth Amendment cases?

22          MR. HELBRAUN:  They are not Eighth Amendment cases.

23  So I will talk about the Eighth Amendment cases -- about the

24  Eighth Amendment for you, Your Honor.

25      Because -- and we're not talking qualified immunity here

1  right now, though I can.  It's a funny thing, because the

2  standard that most police officers are trained to under Graham

3  v. Connor is, of course, the Fourth Amendment, so they're

4  getting the benefit of a lesser standard in this case if Graham

5  v. Connor applied.

6      The Eighth Amendment is a higher standard; deliberate

7  indifference, wantonness.  We believe that's easily cleared

8  here because they testified themselves, Your Honor, that they

9  knew they needed an imminent threat, an active resistance to

10  even deploy the dog in the first place.  They admit they didn't

11  have that.  At a minimum there is a genuine dispute of material

12  fact whether he was an imminent threat, but Casillas and Chris

13  Rodriguez both say he wasn't.  So that's deliberate

14  indifference, that's the Eighth Amendment.

15      They know exactly what harm the dog can cause, they know

16  exactly what situations they're allowed to use it in; they

17  didn't, they did something else.  That's deliberate

18  indifference and wanton.

19      Now, when the dog is deployed and he's on my client, they

20  all say they should not unnecessarily inflict unnecessary harm.

21  They've testified to that.  That's in evidence, Your Honor.

22  And they've also all said that the dog stayed on until he was

23  handcuffed.  And they also, the defendants, admit, it's

24  undisputed, that they did not try to get the dog off, they did

25  not ask the dog handler to take the dog away.  They all admit

1    there are three CDCR officers at least, plus the canine

2    officer, who are there to handcuff my client.  The dog is in

3    the way, Your Honor.  The dog is not helping.  My client is

4    being repeatedly bit by a dog.  The evidence in the case is

5    multiple dog bites.  You can see the records that were

6    submitted by CDCR and their expert Dr. Atkin.

7        So at a minimum, Your Honor, they are prolonging

8    unnecessarily and without justification.  And to do that, that

9    is wanton, Your Honor.  That is deliberate indifference, Your

10   Honor.

11       They are supposedly in a split-second situation, but it's a

12   split-second situation they've created.  They chose the time

13   and place to go in, they chose the way to go in, they chose to

14   go in as quickly as they did.  And I think the videotape

15   clearly shows my client was very close to the door, for

16   whatever reason, and given his testimony, I think there is a

17   reasonable jury who could infer, and taking the light -- the

18   facts in the light most favorable to the plaintiff, that he was

19   trying to surrender, that he was about to surrender.

20       Your Honor, I don't see how the body-worn camera does

21   anything other than perhaps show that his hands weren't

22   outstretched as he said, but it addresses nothing about the

23   lack of justification to deploy the dog in the first place,

24   which was a joint decision, again admitted by all the

25   defendants, where there was no justification as a matter of law

1    under the cases and the rules.

2        And, Your Honor, the reason we cited the Stockton Police

3    Department rules were not only because they apply to the

4    Stockton Police Department but because they show that it's

5    clearly established.  They are evidence of clearly-established

6    law at that point, so the CDCR should also be aware of it and

7    qualified immunity should not apply.

8        The Eighth Amendment is a higher standard, but given their

9    admissions, Your Honor, that they knew the substantial harm

10   caused by a dog, that it's severe force that's considered

11   intermediate and severe, that they knew he was surrounded,

12   alone in the house, so no risk of hostages, no weapons, they

13   were told he had no weapons.  Now, speculation about what he

14   might have or might not, that does not establish imminent

15   threat as a matter of law, Your Honor.

16       Thank you, Your Honor.

17           THE COURT:  Who wants to respond?  I know you

18   responded to all of these arguments in the briefs, but

19   anything any counsel wants to add in response?

20           MR. GHANNAM:  Yes, Your Honor.  Jamil Ghannam, Deputy

21   City Attorney.  I can touch on those, on some of Mr. Helbraun's

22   points.  I'll apologize in advance to the court reporter if I

23   get too on a roll.  I'll try to keep it slow.

24       So I think -- I think the Court kind of hit the nail on the

25   head with this one, and it's that the record taken as a whole.

1    And when you take the record as a whole, and you have this

2    objective sequence of events, and much of the material -- much

3    of the undisputed facts are in fact not disputed, you know, the

4    whole series of events leading up to the point they get to the

5    door, and even unto the time the dog is released, there is

6    absolutely no dispute concerning everything that built up to

7    that moment.  And everything that builds up to that moment,

8    that is the totality of the circumstances.

9         And the issue is not deliberate indifference, the issue is

10   whether they're doing all of this in a good faith effort to

11   maintain and restore discipline, or whether they're doing it

12   maliciously and sadistically.  And no reasonable trier of fact,

13   no jury could look at everything that happened, all of these

14   undisputed facts, and say, oh, yeah, they're just going in

15   there to go, you know, send a dog in on the guy.

16        You know, they're admittedly looking for an individual who

17   escaped from jail.  It's been commonly characterized he walked

18   off, but I don't know how anybody walks over a fence.  You

19   know, he jumped the fence to get away from the work crew.  He

20   then, you know, evades detection for, you know, 21 to 28 days

21   going place to place.  He's purposely going from place to

22   place.  He admitted that he's avoiding the police.  He knows

23   he's an escaped prisoner.  He knows what will happen if he

24   comes into contact with the police.

25        And then when we get to the investigation and everything

1    that's happening on December 21st, you know, they knock on the

2    door, they get no response, the -- some of the task force sits

3    on the house and they watch it, you know, Officer Rodriguez

4    goes back on patrol, he then gets called later, hey, someone

5    came out, we knocked and no one answered, but now someone has

6    come out of the house.  They made contact with him, this is the

7    homeowner --

8              THE COURT REPORTER:  Slow down, please.  Slow down,

9    please.

10             MR. GHANNAM:  I apologize.

11        And then really when the activity picks up is -- and

12   it's -- it's undisputed, the defendants' UMF, I believe it's

13   somewhere in the twenties or thirties, concerning the issue of

14   it being aired over the radio that, hey, he just went out the

15   back.  Now, whether plaintiff in fact fled, attempted to flee

16   or not, you know, that's not really the issue.  The issue is,

17   someone heard something, or perceived something, and, hey, he

18   just fled, he just left.

19        So Officer Rodriguez is in that back yard position, ready

20   to go, ready to go, hey, lock your door, lock your door.  And

21   you know, this -- now he's acting as if we have fresh pursuit.

22   So not only do we have a guy who is, you know, an escaped

23   prisoner who's been gone for a month.  And they were aware of

24   his offense history, that, you know -- primarily that his

25   offense history was possession of a firearm with a high

1   capacity magazine.  So they knew, like, the -- you know, the

2   kind of person that they're dealing with, at least in the back

3   of their mind.  People who are, you know, convicted of

4   possessing weapons just didn't get the chance to attempt

5   whatever they were going to do with the weapon.

6        And so they're looking for this guy, it's aired that he

7   runs, and then all the action is taken after that.  They set up

8   the perimeter.  They search the yards.  They have a tactical

9   meeting to determine, you know, what are we going to do next.

10  None of this is malicious or sadistic.  All of this is to bring

11  him back into custody.  He's been gone for -- this is all

12  maintaining and restoring discipline; which is, you know, an

13  Eighth Amendment standard.

14       And, you know, with the issue at the entry -- or let me

15  back up.  When it comes to the loud speaker announcement,

16  multiple officers from multiple agencies testified, you know,

17  I'm on this position and I heard announcements being aired, you

18  know, for him to surrender.  And, you know, he doesn't respond

19  to that.  So from an objective officer, you know, we knocked on

20  the door, we announced for him to surrender, he's not coming

21  out, we think we have him in there, we're going to start

22  looking for him in there.  You know, they've exhausted, you

23  know, kind of everything they could do to get him to come out

24  peacefully.  So now --

25                 THE COURT:  Just for the record, that was the point I

1   was making in response to the argument.  Whether it was on the

2   loud speaker or not isn't necessarily a material dispute.  It's

3   undisputed he made absolutely no attempt to surrender, no

4   attempt to surrender before December 21st and before that dog

5   was sent in.  He can't dispute that.

6       And now he -- and I understand that he's got a very good

7   lawyer who has tried to marshal as many facts as he can to make

8   it look like this is an Eighth Amendment excessive force case,

9   and that's what good plaintiff's lawyers do.  But as I just

10  said, it just seems to me to be completely undermined by all

11  the facts that you're going through that occurred before the

12  door opened for the ten seconds, the fifteen seconds before the

13  dog was released.  And then after the dog was released he -- he

14  did not in any way yell, come out, say, I hear the dog, leave

15  me alone, I surrender, I surrender.  He didn't do any of that.

16      And I know that plaintiff wants me -- thinks a reasonable

17  jury could infer from the facts that he was doing that, but

18  that's where the body camera footage comes in, and it just --

19  it just belies that testimony.

20      And, again, given the Supreme Court case -- I don't grant

21  summary judgment very often in 1983 cases, but I also don't

22  have body camera footage in most of these cases.  And that, at

23  least under the Supreme Court case that we discussed, makes all

24  the difference in this case.  That and the fact that it's an

25  Eighth Amendment case.

1      I don't think you have to go through and repeat all that's

2    in your brief, I just wanted to sort of give you a chance to

3    respond to the arguments raised by plaintiff's counsel.

4              MR. GHANNAM:  I apologize.

5              THE COURT:  No.  No.  I understand.

6      Let me give counsel for the other defendants, anything that

7    you'd like to add to your arguments?

8              MR. PERKINS:  Good afternoon, Your Honor.  Robert M.

9    Perkins, III, on behalf of CDCR Agents Casillas and Chris

10   Rodriguez.

11     I want to focus the Court's attention on our clients' role,

12   which as plaintiff has noted throughout his papers and his

13   statement of -- his response to the statement of undisputed

14   facts submitted to the Court, plaintiff concedes many of the

15   essential facts, but not all of the essential facts, that made

16   our clients' participation in his physical arrest a stressful

17   situation.

18     To put it into the words of the Supreme Court in Whitley

19   vs. Albers, they are making the decision to apply force in a

20   situation where there is haste, under pressure, and with little

21   opportunities for a second chance.

22     Plaintiff concedes that as they entered the house, the

23   house was dark.  Plaintiffs concede that -- plaintiff concedes

24   that our agents were trying to handcuff Mr. Hughes, someone

25   with mixed marshal arts experience.  Plaintiff concedes that he

1   was on methamphetamines at the time.  Plaintiff even concedes a

2   major fact in paragraph 52 and 51, that he posed a threat to

3   the agents even without a weapon.  Those are the factors that

4   our agents had to consider as they went in and placed handcuffs

5   on him.  That is the undisputed record in this case.

6       Our clients not only had very little of an opportunity to

7   intercede in this case, they also had to contend with a police

8   dog that plaintiff concedes was not under our agents' control,

9   authority, or ability to recall.

10      Plaintiff concedes numerous facts, including the fact that

11  they were not trained canine officers, that our clients

12  necessarily had to defer to the canine officer's judgment on

13  when it was appropriate to recall the canine.  And given how

14  stressful this -- this moment played out in a 55-second window,

15  they had no opportunity to make a quick assessment of whether

16  plaintiff was under their control sufficient to tell the canine

17  officer to withdraw.

18      Plaintiff's only dispute in opposition is that they should

19  have turned to Michael Rodriguez and told him to withdraw the

20  canine.  However, that is not a material dispute of fact, as he

21  concedes all of those facts that would have made it very

22  difficult for our clients to do so.  And to put it into context

23  of the Eighth Amendment, they had no reasonable opportunity to

24  intervene, nor did they have -- nor -- strike that -- but they

25  also responded reasonably to the situation as it unfolded

 1    before them.

 2              THE COURT:  Okay.  Mr. Helbraun, I'll give you the

 3    last word in the argument.  You're muted.  Go ahead.

 4              MR. HELBRAUN:  Thank you.  I'm now unmuted.  Thank

 5    you, Your Honor.  I appreciate it.

 6              THE COURT:  Okay.

 7              MR. HELBRAUN:  Just a couple of points so that I can

 8    make my record, Your Honor.

 9       The deputy sheriff, Mr. Garcia, specifically testified at

10    pages 105 to 106 and at 107 of his deposition, it's in

11    evidence, he confirms that they all knew that it was an error,

12    this idea that my client had fled out the back, and they all

13    knew that before they planned this canine attack.  So that's

14    kind of immaterial and neither here nor there.  It didn't

15    happen, and they knew very well when they were planning this

16    dog attack that that hadn't happened and that was an error.  At

17    a minimum there is a genuine disputed material fact.

18       A couple other things, Your Honor.  You know, a body-worn

19    camera from outside the door is not going to pick up on its mic

20    anybody yelling down the hall.  It's not as strong as the human

21    ear.  So it was unclear to me that perhaps the Court was also

22    saying that the body-worn camera somehow belied my client's

23    testimony because you can't hear him yelling even though he

24    says he was.  And I -- and I -- I'm just making that point for

25    the record, Your Honor.

1        The attorney for the Attorney General said that plaintiff

2   has conceded a few things.  I don't understand what he's

3   talking about.  He says the house was dark.  It was broad

4   daylight out, it was 12:30, 12:45 in the day.  He was not using

5   methamphetamine at the time.  I think the testimony was that he

6   had used some meth before (audio interruption) --

7            THE COURT:  Hang on.  You froze.  We missed that last

8   part.

9            MR. HELBRAUN:  I'm sorry.

10            THE COURT:  Go ahead.

11            MR. HELBRAUN:  He was not on methamphetamine at the

12   time.  The testimony is that he might have taken some

13   methamphetamine about two days earlier.  In fact, the testimony

14   from the defendants is that while they were with him during the

15   apprehension, and after, they had no reason to believe that he

16   was on any drugs.

17        So it's fine with me if their case is, hey, he was an

18   escaped prisoner, he'd been gone three weeks, he gets what he

19   deserves, we used a dog, and, gee, it's the Eighth Amendment so

20   you can't really say that's wanton and sadistic.  That's one

21   thing, Your Honor.  If that's their case, so be it.  But there

22   are not facts that it was dark, there are not facts that he was

23   on drugs, there are not any facts that he was an imminent

24   threat of any kind.

25        We submit that under the policies and the clear law at the

1    time, the very decision to deploy the canine in the first place

2    was wrongful and deliberately indifferent given the state of

3    the law and given the state of the rules and regulations.  And

4    the evidence is undisputed by the defendants' own testimony

5    that they jointly made that decision.

6        There is one other --

7            THE COURT:  Do you understand an Eighth Amendment

8    case is a greater showing than deliberate indifference is

9    required --

10           MR. HELBRAUN:  Of course, Your Honor.

11           THE COURT:  The other thing that I note, I have to

12   tell you you're -- you're a really good advocate.  Your

13   phrasing of evidence is -- and I mean this seriously, is

14   impressive.

15       You and I would disagree that this was a dog attack.  It

16   was a use of a police dog in the apprehension of a criminal.

17       You and I would disagree that there was any thought or any

18   discussion among the police officers that your client is -- you

19   said he -- he gets what he deserves.  I don't think you have

20   any evidence of that type of thought, of prerelease of the dog

21   conversations.  I know you'd like to have that type of

22   evidence, and you'd like to draw conclusions from -- I know at

23   some point in the depositions someone admitted, I think it was

24   M. Rodriguez, that he was angry, but that's in the middle of

25   trying to arrest someone who has evaded the police for three

1    weeks and is actively resisting the police.

2          MR. HELBRAUN:  May I --

3          THE COURT:  I understand.  Again, Mr. Helbraun,

4    that's your job, and I know that's your view of this case.

5    Again, I -- I end where I began, I just don't think that the

6    evidence supports that, or that any reasonable jury could reach

7    that conclusion --

8          MR. HELBRAUN:  I understand, Your Honor --

9          THE COURT:  -- given the evidence in this case.

10         MR. HELBRAUN:  If I could --

11         THE COURT:  Go ahead.

12         MR. HELBRAUN:  One more point for the record, Your

13   Honor.  And I do appreciate your patience, Your Honor.

14      Mr. Ghannam said -- (audio interruption) --

15         THE COURT REPORTER:  I didn't understand that.  I'm

16   sorry, I didn't understand that.

17         THE COURT:  We didn't hear you.  Start over.

18         MR. HELBRAUN:  Mr. Ghannam, the attorney for the

19   Stockton defendants, said, quote, they had exhausted everything

20   they could do before they decided to go on in.  I want to make

21   the point for the record, the homeowner, Hal Ward, came out of

22   that house and told them -- he told them, Corey Hughes wants to

23   surrender, let me go in and get him.  This is the homeowner, he

24   lives there, he just walked out.  And his testimony is, they

25   said, no, we want to use the dog.

1          And, Your Honor, you're correct, of course, deliberate

2     indifference is not the standard, but a reasonable jury can

3     infer wantonness from deliberate indifference.  The cases say

4     that; Furnace says that, Jordan says that.

5          So, thank you, Your Honor.  I will keep it brief, but --

6               THE COURT:  I -- just in response to that last

7     argument, again, in the briefs, that point was directly

8     addressed and it makes complete sense to the Court.  You do not

9     use a citizen who has no police training and no real connection

10    to what's going on in terms of apprehending a dangerous

11    criminal to send him in in lieu of the police.  That just --

12    that's completely unreasonable.  That makes no sense at all.

13    And the police did absolutely the correct thing in making sure

14    that he was no longer involved once he told them that

15    Mr. Hughes was in the house.

16         Did you want to say one other thing?  Go ahead.  You're

17    muted.  You're muted.

18               MR. GHANNAM:  Sorry, Your Honor.  Just one final

19    touch.

20         Defendants' UMF number 58, which was our expert's

21    reconstruction of the entry at the door and the body-worn

22    camera, there was no evidence to dispute the expert's analysis

23    that there is no evidence to demonstrate that Corey Hughes is

24    where he said he was, or that he said anything at the position

25    he said he did because there is -- there is just nothing to

1    support that.  They analyzed the video, they ran it back in

2    multiple different scenarios, and that evidence from the expert

3    is undisputed and it was never challenged.

4        And I'll submit.

5            THE COURT:  Okay.  The matter has been submitted.  I

6    am prepared to rule on the motions for summary judgment.  Let

7    me go through this with you.

8        Again, the Court's ruling -- the oral decision will serve

9    as the Court's decision.  I'm not going to provide a further

10   written order in this matter and the transcript of the hearing

11   today will act as the record in this case.

12       In terms of the Eighth Amendment excessive force claim,

13   beginning with Officer Michael Rodriguez, he faces 1983

14   liability only if there is a showing that he personally

15   participated in the deprivation of a right.  Officers may not

16   be held liable merely for being present at the scene of a

17   constitutional violation or for being a member of the same

18   operational unit as a wrongdoer.  A plaintiff must allege a

19   specific injury that was suffered and show a causal

20   relationship between the defendant's conduct and the injury

21   suffered.

22       Claims of excessive force during an arrest are typically

23   brought under the Fourth Amendment.  That's the Graham vs.

24   Connor case.

25       The Eighth Amendment's prohibition against the use of

1    excessive force attaches after conviction and sentence.  That's

2    the Ingraham vs. Wright case.

3         This plaintiff, Mr. Hughes, was convicted and was serving a

4    term of imprisonment when he escaped from the San Joaquin

5    County Jail, so in this case all parties agree that the Eighth

6    Amendment applies.

7         When you have officers accused of using excessive force in

8    violation of the Eighth Amendment, the core judicial inquiry is

9    whether force was applied in a good faith effort to maintain or

10   restore discipline, or maliciously and sadistically to cause

11   harm.  That's the Hudson vs. McMillian case.

12        After incarceration, only the unnecessary and wanton

13   infliction of pain constitutes cruel and unusual punishment

14   forbidden by the Eighth Amendment.  To allege an unlawful use

15   of force under the Eighth Amendment, a greater showing than

16   deliberate indifference is required.  That's the Jordan vs.

17   Gardner Ninth Circuit case.

18        The Ninth Circuit has identified several factors to be

19   considered in determining whether the use of force in the

20   Eighth Amendment context was reasonable or excessive:  One, the

21   extent of the injury suffered by the inmate; two, the need for

22   application of force; three, the relationship between the need

23   and the amount of force used; four, the threat that was

24   reasonably perceived by the responsible officials, and; five,

25   any efforts made to temper the severity of a forceful response.

1    That's a Ninth Circuit case, Furnace vs. Sullivan.  In that

2    case, in Furnace, the court also considered whether verbal

3    warnings were given prior to the administration of force.

4        In other words, the Eighth Amendment sets a much higher

5    bar, and in this case the Court finds that plaintiff simply

6    cannot reach it.

7        The plaintiff's version of events, to no one's surprise,

8    does differ from Officer Rodriguez -- M. Rodriguez's version.

9    When things are in such a posture, courts are required to view

10   the facts and draw reasonable inferences in the light most

11   favorable to the party opposing the summary judgment motion.

12   However, in this case, as the Court has noted several times, we

13   have body camera footage that captures the events in question

14   and clearly contradicts the plaintiff's version of events.  And

15   when that happens, courts cannot adopt the version of the facts

16   unsupported by the objective record for the purpose of ruling

17   on a motion for summary judgment.  That is the holding in Scott

18   vs. Harris that we have discussed here today.

19       In that instance, where the relevant set of facts have been

20   determined, the reasonableness of the use of force is a pure

21   question of law.

22       In this case, the plaintiff escaped from jail and he had

23   been on the run from law enforcement for almost a month.

24   During that time, law enforcement attempted to apprehend the

25   plaintiff but he managed to avoid their efforts.  As a result,

1   Officer M. Rodriguez reasonably believed that plaintiff might
2   try to evade them again on the morning of the arrest.
3   Plaintiff did not respond or surrender when the officers
4   announced themselves on multiple occasions.  They knocked on
5   the front door, they made announcements, and they shouted into
6   the house through the front door.  Officer M. Rodriguez then
7   sent the canine into the home to search for plaintiff after the
8   officers received no response to their orders directing him to
9   surrender.  At that point, and under those circumstances, it
10  was reasonable for Officer Rodriguez to send the canine into
11  the house.
12      There is a case, a Ninth Circuit case, Miller vs. Clark
13  County, in which a canine deployment was found to be reasonable
14  where the deputy knew the suspect was hiding but not where the
15  suspect was -- but not where he was hiding, and where the
16  suspect was familiar with the area.  The deputy did not know
17  whether the suspect was armed, and the suspect ignored warnings
18  about the release of the canine.
19      Under the facts of this case, that much is clear, and
20  similar to the Miller case, from the body camera footage.
21      Once the canine was released, it quickly located the
22  plaintiff as seen on the body camera.  As soon as the canine
23  grabbed hold of the plaintiff, the officers entered the house
24  and a struggle ensued.  Although you cannot see the struggle,
25  you can clearly hear the struggle, and all parties agree it

1    lasted approximately 55 seconds to a minute.

2        Officer M. Rodriguez actually admits to striking the

3    plaintiff during the struggle; nevertheless, it cannot be said

4    that Officer M. Rodriguez's actions constituted an unnecessary

5    and wanton infliction of pain in the absence of a good faith

6    effort to restore discipline. It was, this Court finds, a

7    reasonable effort to regain custody of an escapee who had

8    established himself as a flight risk.

9        Thus, with no disputes of material fact, the plaintiff's

10   Eighth Amendment claim against Officer M. Rodriguez fails as a

11   matter of law and the Court does grant summary judgment to

12   Officer M. Rodriguez on plaintiff's first cause of action for

13   liability under 42 USC Section 1983.

14       In terms of the other three defendants, Sergeant Molthen,

15   it is undisputed that he was not involved with the entry into

16   the home and he did not in any way physically apprehend the

17   plaintiff.  Plaintiff's Eighth Amendment claim against Sergeant

18   Molthen is based merely on a theory of failure to intercede.

19   Police officers do have a duty to intercede when their fellow

20   officers violate the constitutional rights of a suspect or any

21   other citizen.  But in this case, for the reasons stated by the

22   Court, Officer Molthen cannot be found liable.  Since the Court

23   does not find that Officer M. Rodriguez violated plaintiff's

24   constitutional rights, he had no need to and cannot be found to

25   have failed to intercede such that plaintiff can maintain a

1    claim against him, and the Court grants summary judgment to

2    Sergeant Molthen on plaintiff's 1983 claim as well.

3         In terms of the agents, Harvey Casillas and Chris

4    Rodriguez, the plaintiff's claim -- 1983 claim against these

5    two defendants is based on a theory of failure to intercede.

6    But again, given that the Court finds that Officer M. Rodriguez

7    did not violate plaintiff's constitutional rights when he

8    released the canine and used physical force, it cannot be said

9    that either Agent Casillas or Agent C. Rodriguez failed to

10   intercede.  The plaintiff's claim against these two defendants

11   fails as a matter of law to the extent it's based on this

12   theory.

13        Plaintiff in his opposition alleges his Eighth Amendment

14   claim against Agent Casillas and Agent C. Rodriguez is also

15   based on their own use of excessive force and on the theory

16   that they were integral participants to the use of excessive

17   force.  Plaintiff's allegations that Agent Casillas and Agent

18   C. Rodriguez each used sufficient force against him to violate

19   the Eighth Amendment the Court finds is, again, without merit.

20   The plaintiff alleges that the officers held him down, punched,

21   kneed and kicked him while the dog attacked him, but he cannot

22   specifically identify which officers did so.  And as the Court

23   has noted, an individual cannot be held liable under

24   Section 1983 unless there is a showing that he personally

25   participated in the deprivation of a right, and the plaintiff

1    must allege a causal relationship between the defendant's

2    conduct and a specific injury.

3        The plaintiff does cite to a case, Rutherford vs. City of

4    Berkeley, a 1986 Ninth Circuit case.  The Court found this to

5    be unhelpful.

6        In that case, a case where the Fourth Amendment was at

7    issue not the Eighth Amendment, the court found that the

8    plaintiff's testimony that he was able to see each of the named

9    officers' faces as a number of different officers were beating

10   him was enough for a jury to reasonably infer that the named

11   officers were the ones doing the kicking and punching.

12   Plaintiff does not allege this in this case.

13       Moreover, even if he did or could, the Eighth Amendment,

14   not the Fourth Amendment, applies.  Plaintiff presents no facts

15   that support a finding that any of the unidentified officers or

16   agents took actions constituting an unnecessary and wanton

17   infliction of pain in the absence of a good faith effort to

18   subdue and regain custody of an escapee.  Again, that's the

19   holding in Ingraham.

20       If Officer Rodriguez did not violate the Eighth Amendment

21   by releasing his canine and striking plaintiff in the face,

22   these other two defendants, Agent Casillas and Chris Rodriguez,

23   clearly and definitely did not violate the plaintiff's Eighth

24   Amendment rights.

25       As for the plaintiff's integral participation theory, that

1    also is without merit.  This theory does not require that each

2    officers' actions rise to the level of a constitutional

3    violation, but it does require some fundamental involvement in

4    the conduct that alleged -- allegedly caused the constitutional

5    violation.  That's Boyd vs. Benton County, a Ninth Circuit case

6    from 2004.

7         In the same way that Agent Casillas and Agent Chris

8    Rodriguez cannot be liable for failing to intercede because

9    Officer M. Rodriguez did not violate plaintiff's Eighth

10   Amendment rights, they also cannot be held liable under a

11   theory of integral participation.  There was no Eighth

12   Amendment violation; they cannot participate where a

13   constitutional violation did not occur.  Accordingly, the Court

14   grants summary judgment to Agent Casillas and Agent Chris

15   Rodriguez on plaintiff's first cause of action for liability

16   under 42 USC Section 1983.

17        In terms of the 1983 claim, the defendants all raise, as

18   well, the defense of qualified immunity.  The Court -- even if

19   the Court might be incorrect with respect to whether there was

20   an Eighth Amendment violation, it is clear that as a matter of

21   law, and qualified immunity is a legal issue for the Court,

22   that qualified immunity should be granted and should be found

23   to be applicable to each of these four defendants under the

24   facts of this case, even taken in the light most favorable to

25   the plaintiff.

1        There are two prongs to the qualified immunity inquiry.

2   Even if the Court assumed that there was a constitutional

3   violation, the defendants have certainly carried the day in

4   terms of their arguments that there was no clearly-established

5   law as to their conduct that would put -- would have put them

6   on notice that they were violating the plaintiff's

7   constitutional rights under the facts of this case.  And I

8   would adopt the defendants' arguments with respect to qualified

9   immunity that are set forth in their briefs and find, as well,

10  that that claim, the 1983 claim, could not go forward given

11  that they are entitled to qualified immunity.

12       There is a Bane Act claim in this case that is brought only

13  against the defendant Michael Rodriguez.  The Bane Act,

14  California Civil Code Section 52.1, the state claim, does

15  protect individuals from conduct aimed at interfering with

16  rights secured by federal or state law where the interference

17  is carried out by threats, intimidation, or coercion.

18  Excessive force alone is insufficient to support a violation of

19  the Bane Act.  That's Reese vs. County of Sacramento, Ninth

20  Circuit case from 2018.

21       The Bane Act also requires intent.  Plaintiff's claim is

22  that Officer Rodriguez violated the Bane Act, and that fails

23  just as -- because his Eighth Amendment claim fails, the Bane

24  Act claim must fail as well.  In other words, because Officer

25  Rodriguez -- M. Rodriguez did not violate plaintiff's Eighth

1    Amendment rights, there is no constitutional violation, and

2    therefore there are no facts to support a violation of the Bane

3    Act.

4        Accordingly, plaintiff's claim that Officer M. Rodriguez

5    violated the Bane Act fails as a matter of law and the Court

6    grants summary judgment to Officer M. Rodriguez on that second

7    cause of action.

8        There are two other state tort claims, one for negligence

9    against all four defendants, and one for assault and battery

10   only against M. Rodriguez.

11       State law claims concerning an officer's use of force

12   adheres to the same principles of law as its federal

13   counterpart.  The state law battery claim is a counterpart to a

14   federal claim of excessive use of force.  In Hernandez vs. City

15   of Pomona, the California court held that the Graham factors

16   are to be applied under California negligence claims concerning

17   the Fourth Amendment use of excessive force.  Plaintiff's right

18   to be free from excessive force arises, however, in this case

19   under the Eighth Amendment, and that means Eighth Amendment

20   analysis is again dispositive, and plaintiff's negligence claim

21   against all four defendants, Officer M. Rodriguez, Sergeant

22   Molthen, Agent Casillas and Agent C. Rodriguez, and his assault

23   and battery claim against Officer M. Rodriguez are similarly

24   subject to summary judgment as well.  In Robinson vs. Adams,

25   Eastern District of California case, the jury -- because the

1   jury did not find unconstitutionally excessive force as to

2   plaintiff's Eighth Amendment use of force claims, the

3   defendants were entitled to judgment on corresponding civil

4   battery claims.

5       Also, in Johnson vs. County of Los Angeles, a Ninth Circuit

6   case from 2003, the court held, because we hold that the force

7   used was not unreasonable, the state law claim must fail.

8       None of the officers involved in this case -- none of their

9   actions amounted to an unnecessary and wanton infliction of

10  pain, and there are no facts -- undisputed facts or facts that

11  would create a genuine issue of material fact on this issue.

12      With respect to the negligence claim, Agent Casillas and

13  Agent C. Rodriguez have also argued that they are statutorily

14  immune from liability under California Government Code

15  Section 845.8.  The Court does not need to take up, and does

16  not take up, that argument as well.

17      In sum, the Court grants defendants Michael Rodriguez's and

18  Robert Molthen's motion for summary judgment in its entirety,

19  it grants defendants Harvey Casillas' and Chris Rodriguez's

20  motions for summary judgment in their entirety.

21      If the defendants want some type of written order on the

22  docket, you can draft something, run it by plaintiff's counsel

23  for approval as to form.  But again, as I said, the Court's --

24  the decision here and the transcript will serve as the order

25  that controls for purposes of the Court's decision if it goes

1    up on appeal.

2        I don't know if I've set any pretrial or trial dates, but

3    to the extent I have, those are vacated.

4        All right.  Thank you all.

5                    (Proceedings adjourned, 3:11 p.m.)

6                         ---oOo---

7    I certify that the foregoing is a correct transcript from the

8    record of proceedings in the above-entitled matter.

9

10                            /s/ Kimberly M. Bennett
                              KIMBERLY M. BENNETT
11                            CSR No. 8953, RPR, CRR, RMR

12

13

14

15

16

17

18

19

20

21

22

23

24

25