**FILED**

**Apr 21, 2022**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| COREY HUGHES,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>MICHAEL RODRIGUEZ; ROBERT<br>MOLTHEN; HARVEY CASILLAS;<br>CHRIS RODRIGUEZ,<br>*Defendants-Appellees.* | No. 20-17144<br><br>D.C. No.<br>2:18-cv-03188-<br>JAM-DB<br><br><br>OPINION |

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted October 19, 2021
San Francisco, California

Filed April 21, 2022

Before: Ronald M. Gould and Carlos T. Bea, Circuit
Judges, and Eric N. Vitaliano,[*] District Judge.

Opinion by Judge Bea;
Partial Concurrence and Partial Dissent by Judge Vitaliano

---

[*] The Honorable Eric N. Vitaliano, United States District Judge for
the Eastern District of New York, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment in favor of law enforcement officials in an action brought pursuant to 42 U.S.C. § 1983 and state law alleging that defendants used excessive force in apprehending plaintiff after he escaped from a San Joaquin County Jail highway work crew and lived on the lam for three weeks.

Applying *Scott v. Harris*, 550 U.S. 372, 378 (2007), the panel stated that for purposes of ruling on a motion for summary judgment, a district court may properly view the facts in the light depicted by bodycam footage and its accompanying audio, to the extent the footage and audio blatantly contradict testimonial evidence. The panel determined that in this case, the bodycam footage and audio did not blatantly contradict all of plaintiff's testimony. While the bodycam footage did blatantly disprove plaintiff's claim regarding the duration of his alleged beating by defendants, it did not blatantly disprove plaintiff's claim that he was punched after he was handcuffed. Thus, while the panel viewed the facts blatantly contradicted by the bodycam footage in the light depicted by the videotape and its audio to conclude that plaintiffs did not attempt to surrender to the officers, the panel viewed all other facts, including plaintiff's allegation of the post-handcuff beating, in the light most favorable to plaintiff, the nonmoving party, on summary judgment.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel next considered (1) whether there had been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct.   Because the Eighth Amendment applies equally to convicted prisoners inside or outside the walls of the penal institution, the panel analyzed plaintiff's claim of excessive force under the Eighth Amendment.   The panel held that while the initial use of a dog was clearly proportional to the threat posed by plaintiff before he was handcuffed, whether the alleged post-handcuff beating and dog-biting occurred, and whether it was proportional to the threat Officer Michael Rodriguez reasonably perceived by a handcuffed plaintiff, were questions for the trier of fact.   The panel further held that Officer Michael Rodriguez was not entitled to qualified immunity under § 1983 as to the claimed post-handcuff beating and dog-biting because it was clearly established law that beating a handcuffed convict violates the Eighth Amendment.

While the evidence against Officer Michael Rodriguez was sufficient to survive summary judgment as to plaintiff's claim of post-handcuffed punching and dog-biting, the excessive force claims against Officer Molthen, Agent Chris Rodriguez, and Agent Casillas, based on theories of failure to intervene and failure to intercede, failed as a matter of law.

Concurring in part and dissenting in part, Judge Vitaliano was satisfied that plaintiff's claim of a two-minute beating was blatantly contradicted by the audio and video recordings on the bodycam footage.   That being the case, Judge Vitaliano would affirm the district court in full, and toss aside plaintiff's excessive force and failure-to-intervene claims.   And while Judge Vitaliano concurred in the opinion affirming the judgment for all officers found not to have used excessive force, he concurred only in the judgment on the

failure-to-intervene claims and dissented from the reversal of the grant of summary judgment as to Officer Michael Rodriguez.

---

## COUNSEL

Matthew J. Kita (argued), Dallas, Texas, for Plaintiff-Appellant.

Jamil R. Ghannam (argued), Deputy City Attorney; John M. Luebberke, City Attorney; Office of the City Attorney, Stockton, California; for Defendants-Appellees Michael Rodriguez and Robert Molthen.

Robert M. Perkins III (agued) and Martha Ehlenbach, Deputy Attorneys General; Misha D. Igra, Supervising Deputy Attorney General; Monica N. Anderson, Senior Assistant Attorney General; Rob Bonta, Attorney General; Office of the Attorney General, San Francisco, California; for Defendants-Appellees Harvey Casillas and Chris Rodriguez.

## OPINION

BEA, Circuit Judge:

Corey Hughes escaped from a San Joaquin County Jail highway work crew and lived on the lam for three weeks. It took authorities from three law enforcement agencies and a trained police dog to apprehend Hughes. During his capture, Hughes sustained dog bites and bruising to his leg, and minor abrasions to his head and face.

Hughes sued two Stockton Police Department officers and two California Department of Corrections officers involved in his apprehension under 42 U.S.C. § 1983 for excessive force and brought related state law claims. The district court granted the officers' motion for summary judgment on all claims. Hughes appeals, contending that even though objective bodycam footage largely disproved his testimony, (1) disputes of material fact remain as to whether excessive force was used in violation of the Eighth Amendment and state law, and (2) the officers were not entitled to qualified immunity.

We agree in part. For the reasons discussed below, we affirm summary judgment as to the claims against Officer Robert Molthen, Agent Chris Rodriguez, and Agent Harvey Casillas. But we reverse as to the claims against Officer Michael Rodriguez.

## I.  BACKGROUND

### A.  The Search for Hughes

The facts preceding Hughes's apprehension by law enforcement are largely uncontested. Hughes pleaded guilty to unlawful possession of a loaded firearm with a large

capacity magazine, a misdemeanor offense. While serving his 185-day sentence in the San Joaquin County jail, Hughes was assigned to a highway work crew. On November 27, 2017, just ten days into his sentence, Hughes jumped over a fence while on the work crew and escaped the custody of San Joaquin County.

Hughes was on the lam for more than three weeks. During this time, the San Joaquin County Sheriff's Office joined forces with the California Department of Corrections and Rehabilitation's Fugitive Apprehension Team in the search for Hughes. Agent Chris Rodriguez of the Fugitive Apprehension Team led the investigation into Hughes's whereabouts.

During his investigation, Agent Chris Rodriguez learned the following facts about Hughes: (1) Hughes had prior convictions for possession of a stolen vehicle, weapons possession, and evading a peace officer with disregard for safety, (2) Hughes was affiliated with a violent street gang, (3) Hughes had training in mixed martial arts, and (4) Hughes was possibly under the influence of methamphetamine. These facts led Agent Chris Rodriguez to conclude that Hughes posed a danger to the public and the arresting team.

On December 21, 2017, law enforcement learned from the mother of Hughes's children that Hughes might be hiding at the home of his friend, Hal Ward, at 9041 Don Avenue, Stockton. At 10:30 AM that morning, Agent Chris Rodriguez and Agent Harvey Casillas, also of the Fugitive Apprehension Team, went to Ward's home, knocked on the door, and received no response. Shortly thereafter, Ward exited the home and informed Agent Chris Rodriguez and Agent Casillas that Hughes was inside. Ward gave Agent Casillas his keys and granted permission to enter the home.

Agent Chris Rodriguez contacted members of the Stockton Police Department to participate in the extraction of Hughes from the home. Officer Michael Rodriguez and Officer Robert Molthen arrived at 9041 Don Avenue. Officer Michael Rodriguez was accompanied by Cain, a trained police dog.

The Stockton Police Department and the San Joaquin County Sheriff's Department created a perimeter around the neighborhood and requested fly-over air support from the California Highway Patrol. Officers used a loudspeaker to urge Hughes to exit the home. When this effort was unsuccessful, the Stockton Police Department assembled an entry team consisting of Agent Chris Rodriguez, Agent Casillas, Officer Michael Rodriguez, and Cain. The team gathered in the home's front entryway.

**B. Hughes's Apprehension**

The moment the entry team gathered by the front door is the moment at which the factual accounts diverge. Hughes testified at deposition that he was sleeping in the back bedroom of the home when he heard officers yelling at him from the front door to come out. He shouted back repeatedly at a loud volume, "Hold on, I'm coming out!" until he was just ten feet away from the front door. Hughes walked from the back bedroom with his hands up in a gesture of surrender. He kept his arms up and peered around the corner to make eye contact with Officer Michael Rodriguez. It was only after Hughes made eye contact and showed his empty hands that Officer Michael Rodriguez released Cain. Cain immediately attacked Hughes, which caused Hughes to collapse into the hallway.

Once he was on the ground, officers piled on top of Hughes while Cain continued to bite. Hughes testified that

he did not resist arrest, but that he moved involuntarily in response to Cain biting and pulling at his limbs. After only a few seconds, the officers had Hughes face-down with his hands cuffed behind his back. Once Hughes was handcuffed and subdued, Hughes was punched in the head and face, and Cain continued to bite Hughes, for "two minutes, if not more."

The law enforcement account differs substantially. Bodycam footage from Officer Michael Rodriguez and Officer Molthen shows the law enforcement team assembled just outside the home's open front door. In the footage, Officer Michael Rodriguez can be seen and heard shouting twice, "Stockton P.D., come on out or you're going to get bit by a police dog!" However, there is no audible reply from Hughes. The camera, pointed precisely where Hughes claims to have been standing with his hands up, shows only an empty hallway. Hughes's face and arms are not in the officers' view. Hughes does not appear in the camera's frame until Cain attacks, and Hughes tumbles onto the floor and into the hallway. This footage flatly refutes Hughes' claim that he was standing in the hallway with his arms up in surrender mode.

The officers engaged in a physical struggle with Hughes. Officer Michael Rodriguez testified that his bodycam was kicked off of his chest, and while the footage does not depict the kick, Officer Michael Rodriguez's bodycam does turn off suddenly. Officer Michael Rodriguez admits to punching Hughes in the head before Hughes was handcuffed because Hughes was grabbing Officer Michael Rodriguez's groin area, near the gun on his belt.

The footage clearly refutes Hughes's claim that he was beaten for "two minutes if not more," as no more than a single minute elapses between the moment Officer Michael

Rodriguez releases the dog and the moment Hughes is taken into custody. Importantly, however, the footage does not clearly and unmistakably depict whether punches were thrown before or after Hughes was handcuffed. The defendant officers argue that the audio from Officer Molthen's bodycam contains the unmistakable sound of handcuffs snapping on Hughes's hands, after which Hughes can be heard shouting "Okay! Okay!" and an off-camera officer announces that Hughes is in custody, after which the scene goes quiet, and no sounds of beating or dog biting can be heard. Appellees argue that the series of events indicated by this audio necessarily rebuts Hughes's testimony that he was beaten after he was handcuffed.

After his apprehension, Hughes went to the hospital by ambulance for treatment for the dog bites to his left leg, abrasions to his head and face, and bruising on his upper right thigh. Hughes testified that he has scarring and residual soreness in his left leg due to the dog bites.

## C. Procedural Background

Hughes filed suit in the Eastern District of California. He sued all defendants, Officer Michael Rodriguez, Officer Molthen, Agent Chris Rodriguez, and Agent Casillas, for excessive force under 42 U.S.C. § 1983 and negligence. He sued Officer Michael Rodriguez alone under California's Bane Act[1] and for battery. The defendant law enforcement

---

[1] The Bane Act created a cause of action for "interference or attempted interference by 'threat, intimidation, or coercion' with the 'exercise or enjoyment' of rights under the federal Constitution.'" *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 799 (9th Cir. 2018) (citing Cal. Civ. Code § 52.1).

officers filed motions for summary judgment, which the district court granted as to all claims.

## II.    STANDARD OF REVIEW

"We review a district court's grant of summary judgment and its qualified immunity determinations de novo." *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).

## III.   DISCUSSION

### A.  The Standard on Summary Judgment

#### 1.   The Role of *Scott v. Harris*

"[T]he first step in assessing the constitutionality of [the officers'] actions is to determine the relevant facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Typically, when ruling on a motion for summary judgment, the district court is required to view the facts in the light most favorable to the nonmoving party—in this case, Hughes. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). However, the district court, relying on the Supreme Court's decision in *Scott*, viewed the facts in the light depicted by the officers' bodycam footage. As explained below, the district court properly relied on the bodycam footage and audio to the extent they "blatantly contradicted" Hughes's deposition testimony. *Id.* at 380. However, not all of Hughes's testimony was blatantly contradicted.

In *Scott*, the plaintiff brought an excessive force claim against a police officer after the police officer rammed his vehicle into the plaintiff's vehicle during a high-speed chase. *Id.* at 375. The plaintiff testified that he was driving carefully, while the officer's dashcam footage showed him

speeding, swerving, crossing the double-yellow line, and forcing cars off the road. *Id.* at 379–80.

Justice Scalia, writing for the majority, stated that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. Thus, the district court in *Scott* erred when it denied the officer's motion for summary judgment because instead of viewing the facts in the light most favorable to the plaintiff, it should have viewed the facts in the "light depicted in the videotape." *Id.* at 381.

While *Scott* involved dashcam video footage, courts have since applied its logic to other types of evidence capable of objectively disproving witness testimony. *See Coble v. City of White House*, 634 F.3d 865, 868–69 (6th Cir. 2011) (audio from dashcam footage); *Curran v. Aleshire*, 800 F.3d 656, 663 (5th Cir. 2015) (still photographs); *McManemy v. Tierney*, 970 F.3d 1034, 1038 (8th Cir. 2020) (taser log); *White v. Georgia*, 380 Fed. App'x 796, 797 (11th Cir. 2010) (uncontradicted medical testimony). As the Sixth Circuit concluded in *Coble*, there is "nothing in the *Scott* analysis that suggests that it should be restricted to cases involving videotapes. The *Scott* opinion does not focus on the characteristics of a videotape, but on the 'record.'" *Coble*, 634 F.3d at 868–69.

We agree with the Sixth Circuit and find that, for purposes of ruling on a motion for summary judgment, a district court may properly view the facts in the light depicted by bodycam footage and its accompanying audio, to the extent the footage and audio *blatantly* contradict testimonial evidence.

### 2.  Application to the Bodycam Footage

However, in this case, the bodycam footage and audio do not blatantly contradict *all* of Hughes's testimony. The parties dispute what happened at three key moments during the apprehension of Hughes: (1) whether Hughes shouted to officers that he would exit peacefully, (2) whether Hughes made a gesture of surrender to the officers before Officer Michael Rodriguez released Cain into the home, and (3) whether Officer Rodriguez punched Hughes in the head and face, and allowed Cain to bite Hughes, even though Hughes was handcuffed and subdued.

As to the first two factual disputes, *Hernandez v. Town of Gilbert*, 989 F.3d 739 (9th Cir. 2021) is on point. In *Hernandez*, police officers attempted to extract a DUI suspect from his vehicle. *Id*. at 742. After the suspect refused several verbal warnings, officers deployed a dog. *Id*. The suspect sued for excessive force, claiming that he had "offered to surrender," before officers released the dog. *Id*. at 746. But the bodycam footage did not show any attempts to surrender. *Id*. Relying on *Scott*, this Court affirmed the district court's decision to disregard the suspect's factual account and credit the objective bodycam footage.

We reach the same conclusion here. Hughes's testimony that he yelled to the officers that he was "Coming out!" and that he raised his hands in a gesture of surrender while making eye contact with the officers is blatantly contradicted by the objective bodycam footage and audio. Hughes testified that he yelled he was "Coming out!" when he was only ten feet away from the front door to the home, yet no audible reply to the officer's warnings can be heard in the footage. The camera, aimed precisely where Hughes claims to have been standing with his hands up in a gesture of

surrender, shows an empty hallway. The district court properly discredited this testimony under *Scott.*

However, the district court erred when it disregarded *all* of Hughes's testimony even though only *part* was blatantly contradicted.[2] Hughes also testified that he was not resisting arrest, and that he was punched after he was handcuffed and subdued; Officer Michael Rodriguez testified that Hughes was resisting and that he punched Hughes before he was handcuffed because Hughes was grabbing his groin area, near the gun on his belt. Hughes testified that the beating lasted for "two minutes, if not more," but no more than a single minute elapses between the moment the dog was released and the moment officers announced that Hughes was in custody and the scene goes quiet. But one bodycam, belonging to Officer Michael Rodriguez, had turned off when the alleged punches were thrown. Another officer's bodycam was not pointed directly at the fray. Thus, while the bodycam footage did blatantly disprove Hughes's claim regarding the duration of the beating, it did not blatantly disprove Hughes's claim that he was punched after he was handcuffed. Instead, the defendant officers argue that the *audio* objectively disproves Hughes's account.

This remaining factual dispute makes this case like *Coble.* There, the defendant officer suspected the plaintiff of driving under the influence and followed him in his police car, which was equipped with a dashcam. *Coble,* 634 F.3d at 868–69. When the plaintiff pulled over and exited his

---

[2] While the trier of fact may rely on the rule of *falsus in uno, falsus in omnibus* to decide that a witness who has lied about one material fact must be disbelieved as to all facts, *see* George Fisher, *The Jury's Rise As Lie Detector,* 107 Yale L.J. 575, 654–55 (1997), this rule is not a binding mandate, and is certainly not to be applied by judges ruling on motions for summary judgment.

vehicle, the plaintiff and the officer got into a physical altercation, during which the plaintiff sustained a broken ankle before he was handcuffed. *Id*. These events were captured by the dashcam. But after the officer handcuffed the plaintiff, the two fell out of the camera's frame. The plaintiff testified that the officer required him to walk for over thirty feet on his broken ankle, despite his screams of pain. *Id.* Because the plaintiff and the officer had moved out of frame, the court had only audio available to review.

The Sixth Circuit held that *Scott v. Harris* applied to audio recorded by dashcams. *Id*. at 869. However, even though the plaintiff's screams could not be heard in the recording, the court nevertheless held that the audio did not blatantly disprove the plaintiff's testimony, as it was unclear whether the officer was aware of the broken ankle, or how far the plaintiff was made to walk. *Id*. at 869–70.

Unlike the dissent, after numerous viewings, we are unable to hear the "transcendent, unmistakable whir of handcuffs snapping shut" at timestamp 2:37 in the bodycam footage. Even if we could, the chaos of the struggle and Hughes's cries of pain render it impossible to hear individual punches and whether they were thrown before or after Hughes was in handcuffs. Furthermore, for several seconds after the timestamp, Hughes's cries of pains are still audible, meaning that his claim that he was punched and bitten, for at least some span of time after the handcuffs went on, is somewhat supported.

Thus, while we view the facts blatantly contradicted by the bodycam footage in the light depicted by the videotape and its audio to conclude that Hughes did not attempt to surrender to the officers, we must view all other facts, including the allegation of the post-handcuff beating, in the light most favorable to Hughes.

## B. Excessive Force and Qualified Immunity

Having completed the first step of our analysis, we turn to (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

### 1. The Applicable Constitutional Right

But these questions, in turn, put first the question of *which* constitutional right, protects escaped prisoners from excessive force. The Supreme Court has rejected the "notion that all excessive force claims brought under § 1983 are governed by a single generic standard . . . In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Conner*, 490 U.S. 386, 393–94 (1989) (internal citations omitted).

The Fourth Amendment's "objective reasonableness" standard "governs a free citizen's claim that law enforcement officials used excessive force," in any search or seizure, *id.* at 388, while the Fourteenth Amendment's objective reasonableness standard protects pretrial detainees. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). After conviction, "the Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners." *Whitley v. Albers*, 475 U.S. 312, 327 (1986). To determine the applicable constitutional right in this case requires us to place escaped prisoners, like Hughes, on the custodial continuum, with free citizens on one end and convicted prisoners on the other.

We conclude that the Eighth Amendment applies equally to convicted prisoners inside or outside the walls of the penal institution. The logic of *Whitley* applies with equal force even in the case of an escaped convict, as "the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Id.* at 318 (citing *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40 (1977)).

And although claims of excessive force brought by escaped prisoners are rare, our conclusion conforms to the law of our sister circuits. *See Gravely v. Madden*, 142 F.3d 345, 346–48 (6th Cir. 1998) (holding that the Eighth Amendment applied to an excessive force claim brought by an escaped convict because "[t]he Fourth Amendment is not triggered anew by attempts at recapture because the convict has already been 'seized,' tried, convicted, and incarcerated."). Thus, we analyze Hughes's claim of excessive force under the Eighth Amendment.

## 2. Eighth Amendment Excessive Force

With the relevant facts in hand and the proper constitutional standard identified, we proceed to determine whether Hughes's testimony that was not "blatantly contradicted," *Scott*, 550 U.S. at 380, by the bodycam footage creates a triable issue of material fact as to whether his Eighth Amendment right against excessive force was violated.

In excessive force cases brought under the Eighth Amendment, the relevant inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) (quoting *Whitley*, 475 U.S. at 320–21). This Court applies a five-factor test to determine whether the use of force was malicious and

sadistic: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of the forceful response." *Furnace*, 705 F.3d at 1028 (9th Cir. 2013) (quotation omitted).

First, we examine the extent of Hughes's injuries. Although not binding precedent, in *Koley v. Williams*, No. CV 19-08038-PCT-DWL (JZB), 2021 WL 806935 (D. Ariz. Mar. 3, 2021) (slip copy), the district court concluded that a dog bite with no lasting complications was a minor injury. Here, Hughes testified that he suffered dog bites to his left leg, abrasions to his head and face, and bruising on his upper right thigh. He claims he has scarring and residual soreness in his left leg, but he makes no allegations that these injuries interfere with his work or daily life. We conclude that these injuries are relatively minor, and this factor weighs slightly in favor of the defendant law enforcement officers.

Next, we examine factors two through four—the proportionality factors. We note that the use of biting police dogs on hiding suspects has been repeatedly upheld under the more plaintiff-friendly Fourth Amendment excessive force standard. *See Hernandez v. Town of Gilbert*, 939 F.3d at 739; *Mendoza v. Block*, 27 F.3d 1357 (9th Cir. 1994); *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003). If the officer's conduct does not breach the lower Fourth Amendment standard, it does not breach the higher Eighth Amendment standard.[3]

---

[3] The test for a Fourth Amendment excessive force claim is whether the force used was "objectively reasonable under the circumstances."

Indeed, this case bears a striking resemblance to *Miller*. In that case, the suspect was hiding in woods that were familiar to the suspect, but not to the officers, which afforded him "the opportunity to select a hiding place to maximize [his] strategic advantage." *Id.* at 965. The same is true for Hughes, who was hiding within a home familiar to him, but unfamiliar to the officers. Like in *Miller*, the officers here did not know whether Hughes was armed and, given his prior convictions for weapons possession, had reason to suspect that he was. Just as in *Miller*, Hughes "remained defiant, having ignored [the officer's] warning that he was about to release a police dog." *Id.* "Under these objectively menacing circumstances," Officer Michael Rodriguez was "entitled to assume" that Hughes "posed an immediate threat to his and to the other deputy's safety." *Id.* "Given the gravity of the risk to law enforcement," we conclude that these factors weigh heavily in favor of the officers. *Id.*

We conclude that the initial use of the police dog was proportional to the "threats to the safety of [the officers], as reasonably perceived by the responsible officials on the basis of the facts known to them." *Whitley*, 475 U.S. at 31.

Finally, we look at efforts made to temper the severity of the law enforcement response. Hughes had three weeks to turn himself in. On the morning of his apprehension, officers used loudspeakers urging Hughes to come out of hiding. Officers knocked on the door of Ward's home repeatedly. When officers opened the front door to the home, Officer Michael Rodriguez gave Hughes two warnings to come out or face a police dog. Hughes did not avail himself of any opportunity to turn himself in, respond to any of the officer's

---

*Graham*, 490 U.S. at 397. The test for an Eighth Amendment violation is whether the force was malicious and sadistic. *Hudson*, 503 U.S. at 7.

attempts to make their presence known, or heed any warning that force was coming. Thus, this factor weighs heavily in favor of the defendant officers.

But Hughes's Eighth Amendment claim does not rest solely on the initial use of the dog. If that were the case, our analysis could stop here. Instead, Hughes also testified that he was beaten and bitten after he was fully subdued, with his hands cuffed behind his back. Although Officer Michael Rodriguez insists that he threw the punch before Hughes was cuffed, "[a]t the summary judgment stage the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The portion of Hughes's testimony that was not blatantly contradicted by the bodycam footage creates a triable issue of material fact as to whether Hughes was beaten and bitten after he was handcuffed in violation of the Eighth Amendment. *See Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017) (reversing summary judgment in favor of defendant corrections officers where the inmate plaintiff testified that the officers beat him after he was handcuffed); *Martinez v. Stanford*, 323 F.3d 1178, 1180 (9th Cir. 2003) (reversing grant of summary judgment in favor of defendant corrections officers where the inmate plaintiff testified that officers kicked him in the shoulder and hit him in the back with a baton after he was handcuffed).

While the initial use of the dog was clearly proportional to the threat posed by Hughes before he was handcuffed, whether the post-handcuff beating and dog-biting occurred, and whether it was proportional to the threat Officer Michael Rodriguez reasonably perceived by a handcuffed Hughes, are questions for the trier of fact.

### 3. Failure to Intercede and Integral Participation

Officers can be held liable for failing to intercede in situations where excessive force is claimed to be employed by other officers only if "they had an opportunity to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289–90 (9th Cir. 2000) (finding a failure to intervene claim failed because there was no realistic opportunity for officers to prevent a rapidly unfolding shooting). Furthermore, officers can be held liable for excessive force on a theory of integral participation only if they participate "in some meaningful way" in the specific actions that constituted the violation. *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004).

Assuming *arguendo* that Officer Michael Rodriguez beat Hughes and allowed the dog to bite Hughes after he was handcuffed, the sole alleged acts which could rise to the threshold of an Eighth Amendment violation in this case, the video footage demonstrates that those acts took place during the rapidly unfolding chaos of the physical struggle to apprehend Hughes. Officer Molthen, who was on the other side of the home at the time, and Agents Chris Rodriguez and Casillas, who are not canine handlers, cannot be held liable for fleeting acts which they did not commit, came without warning, and could not have prevented. While the evidence against Officer Michael Rodriguez is sufficient to survive summary judgment as to the claim of his post-handcuffed punching and dog-biting, the excessive force claims against Officer Molthen, Agent Chris Rodriguez, and Agent Casillas, based on theories of failure to intervene and failure to intercede, fail as a matter of law.

### 4.  Qualified Immunity

Qualified immunity is proper unless the plaintiff can establish that "the [officers'] specific conduct violated clearly established federal law." *Sharp v. County of Orange*, 871 F.3d 901, 909 (9th Cir. 2017) (citations omitted). To overcome qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quotation omitted). The plaintiff bears the burden of "point[ing] to prior case law that articulates a constitutional rule specific enough to alert these officers in this case that their particular conduct was unlawful." *Sharp*, 871 F.3d at 911.

In *Hernandez*, we found that to "defeat qualified immunity, [the plaintiff] must show that the state of the law as of [the events at issue] gave a reasonable officer 'fair warning' that using a police dog on a noncompliant suspect, who had resisted lesser methods of force to complete his arrest, was unconstitutional." 989 F.3d at 744 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

If Officer Michael Rodriguez's alleged unconstitutional conduct stopped at the use of the dog to subdue Hughes, he would certainly be entitled to qualified immunity under our precedents in *Hernandez*, *Miller*, and *Mendoza*. However, it is clearly established law that beating a handcuffed convict violates the Eighth Amendment. *Hudson*, 503 U.S. at 4. And "no particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control." *Mendoza*, 27 F.3d at 1362. We hold that Officer Michael Rodriguez is not entitled to qualified immunity under § 1983 as to the claimed post-handcuff beating and dog-biting.

## C.  The State Law Claims

The elements of a Bane Act claim are essentially identical to the elements of a § 1983 claim, with the added requirement that the government official had a "specific intent to violate" a constitutional right. *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018). Whether Officer Michael Rodriguez used excessive force in violation of Hughes's constitutional right, and whether he had a specific intent to do so, are questions properly reserved for the trier of fact.

However, Hughes waived appellate review of his state law battery and negligence claims by failing to include his "contentions and the reasons for them, with citations to the authorities and parts of the record on which [he] relie[d]" in his opening brief. Fed. R. App. P. 28(a)(8)(A).

## IV.    CONCLUSION

We reverse the grant of summary judgment on the § 1983 and Bane Act claims against Officer Michael Rodriguez. We affirm summary judgment as to all other claims.

### AFFIRMED in part and REVERSED in part.

---

VITALIANO, District Judge, concurring in part and dissenting in part:

Just one word separates my views from those of the majority: "genuine."  The majority believes that there exists a genuine dispute of material fact barring an award of

summary judgment in favor of Officer Michael Rodriguez. I do not.

Like the majority, I would not hesitate to apply the rule of *Scott v. Harris*, 550 U.S. 372 (2007), to audio recordings as well as video recordings. That is, where contents of an audio recording "blatantly contradict[]" a party's version of events—just as the videotape in *Scott* did—the factual dispute is not "genuine," and a court should rely on the recording, not the party's discredited testimony, when ruling on his adversary's motion for summary judgment.

Further, like the majority, I conclude that the district court properly relied upon *Scott* to reject Hughes's testimony on two key points: whether Hughes shouted to officers that he would exit his hideout peacefully (he didn't), and whether, before Cain the police dog was unleashed, Hughes made a gesture of surrender to the officers (he didn't). Because audio and video recordings captured by police body cameras firmly contradict those assertions, the majority affirms much of the district court's grant of summary judgment, notwithstanding separate protests that Cain's deployment was disproportionate under the circumstances. So do I.

The majority and I part company, however, over the district court's third and final application of *Scott*. In the crosshairs is Hughes's allegation that, after he had been handcuffed and subdued, Officer Michael Rodriguez continued to punch him and Cain continued to bite him, both for approximately two minutes. The majority finds error in the district court's reliance on *Scott* to hold that Hughes's version of events was conclusively inconsistent with the audio and video recorded by the officers' body cameras. But I find no error.

As is evident from the views we express, the body cameras captured a critical sequence of events.  That sequence is best appreciated when the videos are viewed in tandem.  On the footage, we see and hear Hughes, contrary to the first two factual claims he asserts in this action, failing to surrender in response to police commands, and an officer using a tool to unlock and open a house door.  We see Cain bounding through the doorway, straight for Hughes's torso, and Officer Michael Rodriguez ambling in behind the dog.

The relevant footage from Officer Molthen's camera is different in character from that captured by the other body cameras; after all, by the time Officer Molthen entered the house, Hughes was already on the floor struggling with Officer Michael Rodriguez and others.  More than that, Officer Molthen's body—and, as a result, the video from his camera—was for the most part pointed away from the scrum.  But the audio recording from this officer's footage is essential to a full understanding of the encounter.  It culminates in the transcendent, unmistakable whir of handcuffs snapping shut, followed by an officer's remark, "I got one."  Then, seven seconds later, a second such snap is heard, followed by an officer's announcement, "Code Four. In custody."  Almost instantaneously, Hughes's pained shouts and the officers' barked instructions both cease.

By pairing the audio from Officer Molthen's footage with the same sounds recorded by other officers' body cameras, a full timeline emerges.  We know that what I have described as the sound of the final handcuff snapping shut occurred nearly 70 seconds after Cain bolted through the doorway, and nearly 65 seconds from the start of Officer Michael Rodriguez's loud, off-camera struggle with Hughes.

The sequence of events is of obvious import to our analysis. As the majority observes, a violation of clearly established law occurs when force is used "on a handcuffed arrestee who has fully surrendered and is completely under control." *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994). On this point, we are not divided. When the physical encounter with Hughes began, both human and canine, Hughes was not in custody and was actively attempting to evade arrest. His claims to the contrary we held incredible as a matter of law, because they are "blatantly contradicted" by the collection of bodycam footage in the record.[1]

Focusing on the pre-custody aspect of Hughes's claim, on this record, the only question to be resolved is whether the force committed to putting him into custody was "malicious[] and sadistic[]," *Hudson v. McMillian*, 503 U.S. 1, 7 (1992), and thus violative of the Eighth Amendment. That is a question already answered in the negative by the majority, and it is an answer in which I concur.[2]

Now, although we all agree that there is no genuine dispute as to when Hughes's struggle with the officers began, or as to the constitutionality of the restraining force

---

[1] At various points, the district court's oral decision suggested that Hughes's unreliability as to the circumstances of Cain's deployment rendered his account incredible from start to finish. That is not my reasoning. Rather, it is the contradictions in Hughes's account of a handcuffed beating that render his account of that beating incredible.

[2] Considering Hughes's flight, his failure to surrender or respond to shouted orders, and his history of gun possession, the officers were entitled to assume that he posed a threat and to use force to subdue him, just as the majority concluded. This conclusion absolving members of the arrest team of liability would apply to a punch thrown in the course of securing Hughes's hands for arrest no less than it would to the unleashing of Cain.

they used during the struggle, the majority contends that
there is a genuine dispute of material fact as to when Hughes
came to be fully in police custody.  The majority maintains
that the sounds I have described—the handcuffing; Hughes's
sudden pacification; the radio confirmation of custody by a
member of the arrest team—are not clear enough in
meaning, or not so conclusively supportive of Hughes's
entry into custody, to "blatantly contradict[]" his averment
that he was beaten by officers and bitten by Cain *after* he had
been fully handcuffed and restrained, as the majority
believes *Scott* requires.

  *Scott* instructs that a "blatant[] contradict[ion]"
nullifying the genuineness of any professed dispute of
material fact is one so strong that "no reasonable jury could
believe" the nonmoving party's version of events.  *Scott*,
550 U.S. at 380.  Yet, by opting for the mire of inaudibility
in the teeth of the sounds captured on the footage of
Hughes's arrest, the majority effectively raises the bar even
higher than the mark set by *Scott*.  To classify the moment
of Hughes's arrest as a genuinely disputed fact, given the
commonly understood whir of handcuffs snapping shut, is to
shift the meaning of "contradict[ion]" to the point where a
nonmoving party's story must be wholly inconceivable.  It is
to move the analysis from the realm of "genuine dispute"
into that of metaphysical impossibility. *See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87
(1986) (nonmovant "must do more than simply show that
there is some metaphysical doubt as to the material facts" as
asserted).

  There is more to *Scott*, though, than its black-letter rule.
Indeed, the facts recited by the Supreme Court to sketch the
scene in that case are fundamental to understanding its rule
of decision.  Harris, a speeding motorist, told the district

court that Scott, a police deputy, had rammed Harris's car needlessly, inasmuch as Harris had "remained in control of his vehicle, slowed for turns and intersections, and typically used his indicator for turns." *Scott*, 550 U.S. at 379. But his actual conduct, as hog-tied to the Court's description of videotape evidence from a police-cruiser camera, was very different. The Court perceived that Harris had swerved, run multiple red lights, crossed a double-yellow line, and raced "in the dead of night at speeds that are shockingly fast." *Id.* It was for this reason that the Court reversed an order affirming the denial of Scott's motion for summary judgment; a district court, the Court held, should not view the facts in the light most favorable to the nonmovant when that view is at odds with objective proof offered by a video recording. *Id.* at 380.

Were the "blatant[] contradict[ion]" at the heart of the case—the evidence sufficient to disbelieve Harris as a matter of law—some brute fact, the Court could have dispensed with any number of the inferences it relied upon when analyzing the video. In truth, no speedometer confirmed Harris's "shockingly fast" speed. The video itself[3] is black-and-white and grainy, making it impossible to discern how close Harris actually came to other traffic. Nor does the video appear to explicitly show Harris "cross[ing] a double yellow line." *Id.* at 370. Rather, it is the vague glow and apparent leftward pitch of Harris's taillights that suggest that he did so. To be sure, a defender of the Supreme Court's opinion in *Scott* would reasonably ask, "If that wasn't Harris's car swerving left, then what was it?" But so, too, might a viewer of Officer Molthen's bodycam footage ask, "If those weren't the sounds of handcuffs snapping closed,

---

[3] The video is viewable at https://www.supremecourt.gov/media/video/mp4files/scott_v_harris.mp4.

of Hughes submitting to custody, and of officers confirming
his entry into custody, then what were they?"

Whether it be images from video footage, as in *Scott*, or
sounds on video footage, as here, if but one inference from
common experience explains them, there is no genuine
dispute of material fact as to that issue, and there is nothing
further for a factfinder to find.  *See Harris v. Cnty. of
Orange*, 17 F.4th 849, 857 n.4 (9th Cir. 2021) ("[A]
'possibility' of a factual occurrence is not sufficient to
survive summary judgment.").  This principle, in fact,
extends beyond the purely factual: it has been applied even
to questions of inherently subjective interpretation, such as
the tone of a conversation.  *See Pierson v. Bassett*, 534 F.
App'x 768, 771 (10th Cir. 2013) (summary judgment
granted where, thanks to audio recording, no rational
factfinder would believe nonmovant's claim that his
conversation with an officer was not "tense and
argumentative").

Though the majority contends otherwise, inferring a
blatant contradiction from Officer Molthen's audio is not at
odds with *Coble v. City of White House, Tenn.*, 634 F.3d 865
(6th Cir. 2011).  In *Coble*, the Sixth Circuit reversed a grant
of summary judgment, holding that a plaintiff's account of
off-camera police violence was not "blatantly contradicted"
by the absence of assaultive noises on an officer's
microphone recording.   634 F.3d at 869–70.   *Coble*
illustrates the difficulty in inferring meaning from the
absence of a noise; the opinion rightly observed that "[m]any
factors could affect what sounds are recorded, including the
volume of a sound, the nature of the activity at issue, the
location of the microphone, whether the microphone was on
or off, and whether the microphone was covered." *Id.* at 869.
But these are factors that might explain a noise's absence,

not its presence.  And so *Coble* offers no reasonable analogy to the instant case, where the sounds that I say blatantly contradict the nonmovant's version of events are indisputably audible.

Furthermore, ruling out the conclusiveness of the audio recording of handcuffs snapping shut, as the majority's schema does, has a necessary, but presumably unintended, consequence for the officers charged with failing to intervene in a post-custody assault of Hughes.  As the majority acknowledges, about a minute elapsed between the release of Cain, the immediately ensuing scuffle between Hughes and officers, and the conclusion of that scuffle.  The majority, therefore, leaves open the possibility that Hughes was handcuffed at the very start of the encounter.  Were this the case, Officer Rodriguez could have applied excessive force against a handcuffed Hughes for long as a minute and five seconds: ten seconds longer than it took Jim Jefferies to knock out Jack Finnegan to become the undisputed heavyweight champion of the world on April 6, 1900.  *See Wait a Minute, or Two*, N.Y. TIMES, June 28, 1988, at B7.

Cutting to the quick: unbound by the timing supplied by the sounds of the handcuffing, the arrest team had more than sufficient time to intervene in the supposed assault of Hughes, and a genuine issue lingers as to the liability of any of Officer Michael Rodriguez's partners who were present for the arrest for failing to intercede.  *See, e.g.*, *Cunningham v. Gates*, 229 F.3d 1271, 1289–90 (9th Cir. 2000).  Indeed, Officer Molthen was in the room while officers were trying to handcuff Hughes and engaging in the very skirmish that the majority posits might have been the wanton beating of a handcuffed man.  *See Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004) (holding that an entire team of officers was responsible for the use of a flash-bang because it was

part of their "search operation").  And although Agents Chris Rodriguez and Casillas were untrained in canine handling, that fact has little bearing on their willingness to intervene against Officer Michael Rodriguez—especially if, as the majority believes, the assault were extensive enough to support the plausible pleading of an Eighth Amendment violation.

In other words, if the Eighth Amendment claim against Officer Michael Rodriguez survives, it follows that the failure-to-intervene claims against Officer Molthen, Agent Chris Rodriguez, and Agent Casillas must, too.  Yet the majority does not revive them.  This, of course, is the correct result, but I cannot join the majority's reasoning in reaching it.  Instead of relying on what the majority hypothesizes was the fleeting nature of the alleged post-handcuffing assault (a hypothesis Jack Finnegan would surely reject), I rely on a more fundamental basis for that conclusion: there was no Eighth Amendment violation in which to intercede.[4]  It is the only basis supported by the audio and video recordings in the record.

In the end, with neither the record nor common experience offering a reasonable alternative interpretation of the sounds I identify on the videotapes (the snapping of handcuffs; Hughes's yielding; the confirmation of custody by an officer), I am satisfied that Hughes's claim of a two-

---

[4] The district court seems to have understood that keeping the excessive-force claim against Officer Michael Rodriguez alive would foreclose a finding that the window of opportunity was too narrow for his fellow officers to intervene.  It did not embrace the reasoning now advanced by the majority; instead, it concluded that "[s]ince the Court does not find that Officer M. Rodriguez violated plaintiff's constitutional rights, [the others] had no need to and cannot be found to have failed to intercede."  I, of course, share that view.

minute beating was blatantly contradicted by the audio and video recordings on the bodycam footage.  That being the case, I would affirm the district court in full, toss aside Hughes's excessive force and failure-to-intervene claims, and revel in the sound quality of modern computer speakers. And while I concur in the opinion affirming the judgment for all officers found not to have used excessive force, I concur only in the judgment on the failure-to-intervene claims, and I dissent from the reversal of the grant of summary judgment as to Officer Michael Rodriguez.